IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| THELMA L. LASSETER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 7:06-CV-14-BH |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent Case |

## MEMORANDUM OPINION AND ORDER

Pursuant to the provisions of Title 28, United States Code, Section 636(c), and an Order of the Court dated April 25, 2006, in implementation thereof, subject cause has been transferred to the undersigned United States Magistrate Judge. Before the Court are *Brief for Plaintiff*, filed August 19, 2006, and *Defendant's Brief in Response to Plaintiff's Brief*, filed October 17, 2006. Plaintiff did not file a reply. Having reviewed the evidence of the parties in connection with the pleadings, the Court finds that the final decision of the Commissioner should be **AFFIRMED**.

### I. BACKGROUND[1]

**A. Procedural History**

Thelma Lasseter ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income. Plaintiff filed an application for Supplemental Security Income under Title XVI of the Social Security Act on March 28, 2003. (Tr. at 54-56). Plaintiff claimed she was disabled due to degenerative disc

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

disease with spinal fusion. (Tr. at 75). Plaintiff's application was denied initially and upon reconsideration. (Tr. at 27-32, 35-37). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 38.) A hearing, at which Plaintiff personally appeared and testified, was held on March 2, 2005. (Tr. at 185-220). On April 7, 2005, the ALJ issued his decision finding Plaintiff not disabled. (Tr. at 12-20). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 4-6). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 4). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on January 23, 2006.

**B. Factual History**

*1. Age, Education, and Work Experience*

Plaintiff was born on June 3, 1960. (Tr. at 54). She earned a high school equivalency degree ("GED") and attended college for one year. (Tr. at 81, 190). She previously worked as a hostess at a restaurant, a cashier at several grocery stores and McDonald's, and as a maid. (Tr. at 66).

*2. Medical Evidence*

Plaintiff has a history of cervical and lumbar disc disease. (*See e.g.*, 139-84). On December 27, 2002, Dr. Sanjoy Sundaresan, M.D., a neurologist, ordered an MRI of Plaintiff's lumbar spine. (Tr. at 120; *see* Tr. at 126). Dr. Paul Renton, M.D., a radiologist, interpreted the MRI to show "(1) [s]mall, right lateral disc bulge at the L5-S1 level. If clinically relevant, symptoms should be referable to the right L5-S1 nerve root distribution. (2) Otherwise, negative MRI of the lumbar spine." (Tr. 120). On December 30, 2002, Dr. Terry R. Seegers, M.D., a radiologist, performed an MRI of Plaintiff's cervical spine that was requested by Dr. Sundaresan. (Tr. at 118). The MRI of

the cervical spine showed "(1) [p]ost surgical changes at C5-C6 with fusion of the disc space at that level. (2) Disc bulges are present at C4-C5 and C6-C7, causing spinal canal stenosis." (Tr. 118). Also on December 30, 2002, Dr. Seegers performed an MRI of Plaintiff's thoracic spine that showed "(1) Small, right lateral HNP [herniated nucleus pulposus] at T10-T11." (Tr. at 119). He also remarked that "[t]here is some mild neural foraminal stenosis on the right at this level. Images of spondylosis are seen with disc space narrowing at multiple levels." *Id*.

On February 6, 2003, Dr. Sundaresan entered a note regarding a recent examination of Plaintiff. (Tr. at 117). He wrote that Plaintiff continued to have severe radiating pain in her neck and lower back and that MRIs showed disc bulges at the C4-5, C6-7, and L5-S1 levels. *Id*. He also noted that numerous conservative treatments had failed. *Id*.

On May 16, 2003, Dr. Casner, a non-examining State Agency Medical Consultant ("SAMC") reviewed Plaintiff's available medical records. (Tr. at 106-113). Dr. Casner noted Plaintiff's C4-5, C6-7, and L5-S1 disc bulges and that Plaintiff could walk without assistance. (Tr. at 107-08). He determined that Plaintiff's allegations of disability were only partially supported by the medical evidence and that they did not rise to the level of a listed disability. (Tr. at 111).

On June 12, 2003, Kimberly Havins, R.N., C-F.N.P., examined Plaintiff during her visit to the office of Dr. Danny Bartel, M.D., a neurologist. (Tr. at 104). Plaintiff reported that she continued to have "neck pain and lower back pain" and that she was currently seeing Dr. Sundaresan who recommended surgery. *Id*. Plaintiff took Lortab and Soma for her pain, and she stated the medications were effective. *Id*. On examination, Nurse Havins noted "some decreased range of motion in her cervical spine in either direction with paraspinal muscle tenderness that extends into her trapezius muscles and scapular areas." *Id*. Plaintiff also had paraspinal muscle tenderness in

her lumbar spine that extended into her iliac crest areas. *Id*. Plaintiff had a straight leg raising at 60 degrees on the right. *Id*. Her reflex and sensory tests were unremarkable, and Plaintiff walked "with a wide based gait without assistance." *Id*. Nurse Havins diagnosed Plaintiff with (1) cervical disc disease; and (2) lumbar disc disease. *Id*. Nurse Havins prescribed Celebrex "as adjunct treatment to her pain medicine" and requested to see Plaintiff again in two to three months. *Id*.

On July 10, 2003, Plaintiff saw Jimmy Whetsell, P.A.-C, at Dr. Sundaresan's clinic. (Tr. at 116). Plaintiff reported that her neck and lower back pain were severe and getting progressively worse. *Id*. On examination, Mr. Whetsell noted that Plaintiff ambulated without assistance and was "grossly neurologically stable." (Tr. 116).

On July 23, 2003, Dr. Sundaresan performed a thoracolumbar discogram that showed "[a]nnular tear/internal disk disruption [at] L4-5 with moderate concordant pain." (Tr. 115). Dr. Sundaresan performed a cervical discogram on August 6, 2003, that showed "[a]nnular tear/internal disk disruption [at] C45, 6-7 with moderate concordant pain." (Tr. 114).

On September 12, 2003, Plaintiff returned to Dr. Bartel's clinic for a follow-up exam with Nurse Havins. (Tr. at 135). Plaintiff reported radiating neck and lower back pain and told Nurse Havins that Medicaid would not pay her for scheduled surgery with Dr. Sundaresan. *Id*. On examination, Nurse Havins noted paraspinal muscle tenderness in her cervical and lumbar spine. *Id*. Plaintiff had straight leg raising at 60 degrees bilaterally and intact ankle and knee jerks. *Id*. Her strength was 4/5 and symmetric, and she walked with a wide base gait without assistance. *Id*. Nurse Havins diagnosed Plaintiff with cervical and lumbar disc disease and added Mobic to her pain management medication. (Tr. at 136). Nurse Havins also referred Plaintiff to the Community Healthcare Clinic and requested a follow-up examination in two months. *Id*.

Plaintiff returned to Dr. Bartel's clinic on February 10, 2004, and saw Nurse Havins again. (Tr. at 134). Nurse Havins noted that Plaintiff "tried to be seen at the Community Healthcare Clinic for her general health care needs, however, she was unable to afford the appointment." *Id*. Plaintiff's physical examination was the same as September 12, 2003 visit, and Plaintiff reported that the Lortab and Soma helped with her back pain. *Id*. Nurse Havins referred Plaintiff to the Wichita Falls Residency Program indigent care clinic for her general health needs and requested a follow-up visit in two months. *Id*.

Nurse Havins examined Plaintiff again on May 4, 2004. (Tr. at 133). Nurse Havins noted that Plaintiff did not follow-up on her referral to the indigent care clinic. *Id*. The physical examination was the same as it was before, and Plaintiff was again referred to the indigent care clinic. *Id*. Nurse Havins reiterated the importance of her following up with the indigent care clinic to establish treatment, and Plaintiff's daughter was present during the conversation. *Id*

On February 28, 2005, Dr. Bartel completed a questionnaire entitled "Medical Assessment of Ability to Do Work-Related Activities (Physical)." (Tr. at 137-38). The questionnaire noted that Plaintiff could occasionally and frequently lift, carry, or both 20 pounds and that she could stand or walk 15 minutes without interruption for a total of two hours. (Tr. at 137). Plaintiff could sit without interruption for 1-2 hours for a total of two hours. *Id*. Dr. Bartel also checked that Plaintiff could "never" climb, balance, stoop, crouch, kneel, or crawl; that her abilities to reach, handle, push/pull, and feel were affected, but her abilities to see, hear and speak were not; and that she was restricted as to heights, moving machinery, temperature extremes. (Tr. at 138).

### *3. Hearing Testimony*

A hearing was held before the ALJ on March 2, 2005. (Tr. at 185). Plaintiff appeared

personally and was represented by an attorney. *Id*. A witness also testified.

### a. *Plaintiff's Testimony*

Plaintiff testified that she was born on June 3, 1960, and that she was 45 years old on the date of the hearing. (Tr. at 190). She earned her GED and attended college for one year. *Id*. She had been married three times, was currently engaged and resided with her fiancé. (Tr. at 191-92).

Plaintiff testified that she was 5'6" tall and weighed 115 pounds. (Tr. at 192). She last worked in April of 2001 as a grocery clerk but had to quit because she "just couldn't do the work. It hurt [her] too bad." (Tr. 193). Plaintiff alleged she was disabled because she needed stronger bones and had four ruptured discs. (Tr. at 194). She had an operation in 1999 to fuse her cervical spine at C5 and C6. (Tr. at 195-96). Plaintiff testified that although the surgery was successful, she began to have problems with her other discs. (Tr. at 196). She testified that she was scheduled to have further surgery to fuse more vertebrae "as soon as [she] g[o]t the money for it"; she had no income or insurance. (Tr. at 196-97). She took Lortab and Soma for her pain and experienced occasional drowsiness from the medication; however she had not been taking them because of financial constraints. (Tr. at 200, 210).

Plaintiff testified that Dr. Bartel last examined her in May of 2004. (Tr. at 197). When the ALJ asked Plaintiff about the February 28, 2005 residual functional capacity ("RFC") assessment, Plaintiff said that Dr. Bartel reviewed her file and completed her form but did not examine her because she did not have the money. (Tr. at 197-98).

The ALJ then asked Plaintiff to describe her daily activities. Plaintiff testified that she usually got out of bed around 10 AM. (Tr. at 198). She could take care of her personal hygiene, except that she could not wash her hair by herself. (Tr. at 199). She said that she could "do dishes

for about two seconds" before pain radiated up her arms and into her back. *Id*. She prepared breakfast for herself but did not do the laundry because her back hurt when she bent or stooped. (Tr. at 200). She was able to do light housework. *Id*. Plaintiff had bad days approximately four days out of a week and spent those days in bed. (Tr. at 201). On better days, she liked to draw and paint. (Tr. at 203). Plaintiff did not drive because her license expired. (Tr. at 202-03). She spent most of her time at home, never shopped, and occasionally visited her mother, who lived 45 minutes away. (Tr. at 204).

Under examination by her attorney, Plaintiff testified that her conditioned worsened in the intervening months between her last examination by Dr. Bartel and the date of the RFC assessment. (Tr. at 204-05). She also testified that she experienced migraine headaches, could use her hands for 15-20 minutes before they became numb, and frequently dropped things. (Tr. at 205-08).

### b. *Witness Testimony*

Mark Bull, Plaintiff's fiance, testified that Plaintiff's activities around the house were very limited and that he performed most of the housework. (Tr. at 213-14). His opinion was that there was "no way" Plaintiff could work at an eight-to-five job. (Tr. at 214).

### c. *Vocational Expert's Testimony*

Clifton King, a vocational expert ("VE") testified that Plaintiff's past relevant work experience included (1) manager fast food (light, SVP of 5, semi-skilled, unskilled, lower-level skilled), and (2) cashier checker (light, SVP of 2, unskilled). (Tr. at 217). Plaintiff's past employment as a maid was of insufficient duration to constitute relevant past work experience. *Id*.

The ALJ presented a hypothetical individual with the same educational background and work experience as Plaintiff. The hypothetical person had the following exertional limitations:

occasionally lift or carry no more than 20 pounds; frequently lift of carry 10 pounds; stand and/or walk six hours in a normal work day; sit for a total of six hours in a normal work day; occasionally balance, stoop, kneel, crouch, and crawl; and mild fatigue, anxiety, and discomfort affecting her ability to work in a competitive environment. (Tr. at 218). The VE testified that such limitations did not preclude the hypothetical person from performing any of Plaintiff's previous jobs. *Id.*

Plaintiff's counsel asked the VE whether the hypothetical person could perform Plaintiff's past jobs if she were unable to sit for more than an hour and a half during an eight-hour work day or stand and walk for more than two hours in an eight-hour work day. *Id.* The VE testified that such a person would not be able to maintain either Plaintiff's previous employment or any other employment. *Id.*

## C. ALJ's Findings

The ALJ issued his decision denying benefits on April 7, 2005. (Tr. at 12-20). In his findings, he determined that Plaintiff had not engaged in substantial gainful employment since the alleged onset date of disability, October 23, 1997. (Tr. at 16; Tr. at 20, ¶1). The ALJ determined that Plaintiff's degenerative disc disease, cervical fusion, and headaches were severe impairments within the meaning of 20 C.F.R. § 416.920(c), but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart B, Regulation number 4. (Tr. at 17-18; Tr. at 20, ¶¶2, 3).

In determining Plaintiff's RFC, the ALJ found that Plaintiff's allegations regarding her limitations were not supported by credible facts and findings. (Tr. at 18; Tr. at 20, ¶4). The ALJ noted that Plaintiff's pain was relieved by pain medication but that she was not currently taking the pain medication due to lack of funds. (Tr. at 18-19). The ALJ also noted that Dr. Bartel last

examined Plaintiff in May of 2004 and that Dr. Bartel's medical assessment of Plaintiff's RFC dated from March of 2005. (Tr. at 19). The ALJ further noted that Plaintiff did not follow up on her referrals to the indigent care clinic for help with her medical needs. *Id*. The ALJ then determined that Plaintiff retained the RFC to perform light work activity. (Tr. at 19; Tr. at 20, ¶5). Specifically, the ALJ found that Plaintiff could perform all postural activities occasionally and had a mild level of anxiety, discomfort, and fatigue. *Id*. The ALJ concluded that Plaintiff's medically determinable impairments did not preclude her from returning to her past relevant work as a cafeteria manager, cashier checker, and fast food worker. (Tr. at 19; Tr. at 20, ¶¶6, 7). As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of his decision. (Tr. at 19; Tr. at 20, ¶8).

## II. ANALYSIS

### A. Legal Standards

#### *1. Standard of Review*

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, but less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2. *Disability Determination*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be

disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B. Issue for Review: Residual Functional Capacity**

Plaintiff presents a single issue for review: "[w]hether the ALJ's finding as to Plaintiff's residual functional capacity, and his resulting finding of non-disability, is supported by substantial evidence." (Pl. Br. at 1). Plaintiff contends that the ALJ should have (1) given controlling weight to the medical assessment questionnaire completed by Dr. Bartel, her treating physician, and (2)

considered Plaintiff's inability to pay for medical treatment as an explanation for her infrequent medical examinations. (Pl. Br. at 9-12).

### *1. Treating Physician's Opinion*

The Court first considers the ALJ's decision to accord little weight to Dr. Bartel's February 28, 2005 medical assessment questionnaire. In the Fifth Circuit, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with…other substantial evidence.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)). "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). If good cause exists, an ALJ may give a treating physician's opinion little or no weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 456.

In the instant case, the ALJ discounted the weight given to Dr. Bartel's medical assessment questionnaire because it was based upon a review of Plaintiff's medical files and not upon an examination. (Tr. at 19, 197-98). Dr. Bartel's most recent examination of Plaintiff took place more

than eight months before he completed the questionnaire. *Id*. At the administrative hearing, the ALJ stated that Dr. Bartel's completion of the questionnaire without an examination was an "unusual practice." (Tr. at 198). He also stated that the lack of accompanying treatment notes from the intervening eight months detracted from the weight he normally would assign to the document. *Id*. These two reasons provided by the ALJ show that the medical assessment questionnaire was not well supported by medically acceptable clinical and laboratory diagnostic techniques.[2] *See* SSR 96-2p, 1996 WL 374188, *4 (S.S.A. July 2, 996). Additionally, Plaintiff does not cite, nor has the Court found, any restrictions by Plaintiff's treating physicians on her physical activities. (*See* Tr. at 104-136). Dr. Bartel's imposition of physical restrictions in the medical assessment questionnaire contradicts the absence of such restrictions in the medical treatment notes. SSR 96-2p, 1996 WL 374188, at *4. To the extent that the medical assessment questionnaire contradicts other relevant medical evidence, conflicts in the evidence are for the ALJ to resolve, not the court. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)).

Plaintiff contends that per *Newton*, the ALJ was required to perform a six-factor analysis before deciding not to give any weight to Dr. Bartel's opinion. (Pl. Br. at 10-11). However, the detailed six-factor analysis established in *Newton* does not apply because "*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Contreras v. Massanari*, 2001 WL 520815, at *4 (N.D. Tex. May 14,

---

[2]Although not stated in his findings, the ALJ discerned at the administrative hearing that Dr. Bartel prepared the questionnaire the day before the hearing and that Dr. Bartel was aware the hearing pertained to Plaintiff's application for SSI benefits. (Tr. at 198). In evaluating medical evidence, the ALJ has the discretion to reject statements prepared in anticipation of litigation. *Harrell v. Bowen*, 862 F.2d 471, 482 (5th Cir. 1988).

2001); *see also Newton*, 209 F.3d at 458; *Pedraza v. Barnhart*, 2003 WL 22231292, at *5 (W.D. Tex. Sept. 15, 2003). Here, the ALJ did not summarily reject Dr. Bartel's opinion; he only rejected the medical assessment questionnaire that was based upon a review of Plaintiff's medical files and her own statements and not upon an examination. In fact, the findings show that the ALJ relied upon Dr. Bartel's treatment records to assess the severity of Plaintiff's alleged impairments as well as her RFC. (*See* Tr. at 17-19).

Plaintiff also contends that the ALJ's proffered explanation for why he discounted the weight of the medical assessment questionnaire was "woefully inadequate." (Pl. Br. at 11-12) (citing SSR 96-8p and *Southard v. Barnhart*, 72 Fed. Appx. 781, 784-85 (10th Cir. 2003) (finding that the ALJ ignored letters from the treating physician and did not perform the required analysis outlined in 20 C.F.R. § 404.1527(d)). However, SSR 96-8p does not apply because, as explained previously, the medical assessment questionnaire is neither well-supported by medically acceptable clinical and laboratory diagnostic techniques nor is it consistent with Dr. Bartel's treatment notes. *See* SSR 96-8p, 1996 WL 374184, *7 (S.S.A. July 2, 1996). For this same reason, and because the transcript testimony showed that the ALJ did not ignore the medical assessment questionnaire, *Southard* is inapposite. *See Southard*, 72 Fed. Appx. at 785.

For the foregoing reasons, the Court finds that the ALJ had good cause not to give controlling weight to Dr. Bartel's medical assessment questionnaire when he determined Plaintiff's RFC. *Newton*, 209 F.3d at 456; *Martinez*, 64 F.3d at 176.

### *2. Inability to Pay*

As part of her argument that the ALJ's RFC finding is unsupported by substantial evidence, Plaintiff contends that the ALJ improperly considered Plaintiff's failure to seek treatment as an

indication of non-disability. (Pl. Br. at 12-13). Specifically, Plaintiff asserts that it was improper for the ALJ to reject her testimony that she was unable to afford treatment as an explanation for why she did not have more frequent medical examinations. (Pl. Br. at 12-13; Tr. at 19). In support of this assertion, Plaintiff cites to SSR 96-7p, which states, in relevant part, that the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide...For example...The individual may be unable to afford treatment and may not have access to free or low-cost medical services." SSR 96-7p, 1996 WL 374186, *7-8 (S.S.A. July 2, 2006). If a "claimant cannot afford prescribed treatment or medicine, and can find no way to obtain it, 'the condition that is disabling in fact continues to be disabling in law.'" *Lovelace*, 813 F.2d at 59 (5th Cir. 1987) (citing *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)).

In the instant case, Nurse Havins referred Plaintiff to two different free or low-cost medical care facilities in the Wichita Falls area. (Tr. at 133, 134, 136). When Plaintiff reported that she was unable to afford the appointment at the first referral, the Community Healthcare Clinic, Nurse Havins referred Plaintiff to the indigent care clinic at the Wichita Falls Residency Program. (Tr. at 134). Plaintiff did not follow-up on this second referral despite Nurse Havins' reiteration on May 4, 2004, of the importance of doing so. (Tr. at 133). In the documents submitted to the ALJ and in her hearing testimony, Plaintiff provided no explanation for why she did not seek treatment for her alleged impairments from free or low-cost alternatives. Thus, the requirement that the ALJ consider Plaintiff's inability to pay for medical treatment does not apply because Plaintiff has not shown that

she did not have access to free or low-cost medical services.³ *See* SSR 96-7p, 1996 WL 374186, at *8; *see Lovelace*, 813 F.2d at 59. The ALJ therefore properly considered Plaintiff's failure to seek treatment as an indication of non-disability when he assessed her RFC.

### *3. Substantial Evidence*

Having found that the ALJ had good cause to reject Dr. Bartel's medical assessment questionnaire and that Plaintiff's inability to pay for medical treatment was not a valid explanation for her failure to seek more frequent medical examinations, the Court now considers whether substantial evidence supports the ALJ's determination of Plaintiff's RFC. When assessing a claimant's physical abilities, the ALJ first assesses the nature and extent of the physical limitations and then determines the RFC. 20 C.F.R. § 404.1545(b). "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id*. "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting." *Id*. at *2 (emphasis in the original). The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837

---

³Plaintiff cites to *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003), for the proposition that Plaintiff's explanation that she could not afford medical care deprives the ALJ of substantial evidence for his RFC finding. (Pl. Br. at 13). *Newell* is inapposite because Plaintiff has not shown that she did not exhaust free or low-cost alternatives. Additionally, the Court notes that *Newell* relates to a Step 2 finding of a severe impairment, not a Step 4 finding of ability to perform past relevant work as is the situation in the instant case. *Newell*, 347 F.3d at 547.

F.2d 1378, 1386-87 (5th Cir. 1988).

In the instant case, Plaintiff's treating physicians diagnosed her with cervical and lumbar disc disease. (Tr. at 104). On May 4, 2004, the date of her last examination before her March 2, 2005 administrative hearing, Plaintiff had muscle tenderness in her cervical spine and a decreased motion. (Tr. at 133). However, her arm strength was 4/5 on the left and 4+/5 on the right, she was not in acute distress, and she ambulated without assistance. *Id*. The May 4, 2004 physical assessment was similar to Plaintiff's previous examinations. (*See e.g.*, Tr. at 104-05, 134-36). Although there is no question that Plaintiff suffered from some impairment, Plaintiff has not shown how these limitations prevented her from performing her past relevant work. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (noting that the mere presence of some impairment is not disabling per se). Plaintiff also reported that her pain symptoms were controlled with medication. (Tr. at 104, 134). A medical impairment that can reasonably be controlled by medication, surgery, or treatment is not disabling. *Lovelace*, 813 F.2d at 59. Although Plaintiff indicated that she was not always able to afford her medication, Plaintiff has not shown that she exhausted free or low-cost medical care alternatives. (*See* Part II.B.2, *supra*). Additionally, during the administrative hearing, the ALJ questioned Plaintiff about her daily activities. *Leggett*, 67 F.3d at 565, n. 12 (daily activities are appropriately considered in evaluating a claimant's disability status). Plaintiff reported that she takes care of her personal hygiene and is able to do light housework. (Tr. at 199-200). She also takes occasional trips to visit her mother, who lives 45 minutes away. (Tr. at 204). Based on this testimony regarding Plaintiff's daily activities, the ALJ found that "[t]here is no indication that her daily activities were curtailed to an extent that would suggest an inability to engage in all work activity." (Tr. at 18).

Based on a review of the administrative record, the Court finds that substantial evidence

supports the ALJ's finding that Plaintiff retained the RFC to perform light work activity. *Leggett*, 67 F.3d at 564. Accordingly, Plaintiff has not met her burden to show that she was incapable of performing her past relevant work, and thus disabled within the meaning of the Social Security Act, at any time through the date of the ALJ's decision. *Id*.

### III. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED**.

**SO ORDERED**, on this 30th day of October, 2007.

```
                                   _____
                                   IRMA CARRILLO RAMIREZ
                                   UNITED STATES MAGISTRATE JUDGE
```